**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**Plaintiff,**<br>**vs.**<br><br>**LESHON EUGENE JOHNSON,**<br>**a/k/a Shon Johnson,**<br><br>**Defendant.** | **Case No.: 25-cr-12-JFH** |

**DEFENDANT'S MOTION TO COMPEL**
**PRODUCTION OF RECORDS REGARDING SEIZED DOGS**

Defendant, LeShon Johnson, by and through his undersigned counsel, respectfully moves this Honorable Court for an Order compelling the United States of America (hereinafter "the Government") to produce all records, documents, data, and tangible evidence related to the care, condition, behavior, and treatment of the 190 dogs seized in connection with this case, including comprehensive records for the 12 dogs that have died while in government custody, from the date of their initial seizure to the present. These records are currently in the possession, custody, or control of the Government, including the U.S. Marshal Service and the federal contractor responsible for the daily care of the animals.

**BACKGROUND**

1. On May 14, 2025, a Superseding Indictment was filed charging Defendant Leshon Eugene Johnson with violations of 7 U.S.C. § 2156, 18 U.S.C. § 49, and 18 U.S.C. § 2, related to an alleged animal fighting venture. Dkt. No. 94.

2. A central component of the Government's case involves approximately 190 dogs seized from properties allegedly associated with Mr. Johnson on or about October 17, 2024. Dkt. No. 94,

¶¶ 16, 18). These animals have since been in the custody of the U.S. Marshal Service and under the day-to-day care of an unnamed federal contractor.

3. The Government provided initial intake assessments for these animals. However, on April 14, 2025, on the eve of a scheduled defense inspection, the Government informed defense counsel for the first time that 12 of the 190 seized dogs had either died or been humanely euthanized while in USMS care, assertedly due to "existing medical conditions" or despite medical intervention. Sarah Brown, email to Courtney Jordan (April 14, 2025), attached as Exhibit 1.

4. Despite repeated requests from defense counsel, the Government has failed to produce all subsequent records concerning the ongoing care, veterinary treatment, behavioral assessments, housing conditions, or any other documentation related to these 190 animals, including detailed records pertaining to the circumstances and causes of death or euthanasia for the 12 deceased dogs. Sarah Brown, email to Courtney Jordan, (May 8, 2025), Exhibit 2, p. 1-3.

5. The Government has asserted that "nothing occurring after initial seizure was documented is evidence" and that "a general request regarding the post-seizure condition of the dogs is not discoverable material." Exhibit 2, p. 2. This stance, coupled with the death of 12 dogs constituting primary evidence, significantly prejudices the Defendant's ability to prepare a defense and raises serious concerns about the preservation and integrity of evidence.

6. Following the email exchanges in April and early May 2025, and the conference call between counsel for the Defense and the Government that took place on May 14, 2025, counsel for the Government provided a written response to defense counsel's outstanding discovery requests via email on May 16, 2025. Sarah Brown, email to Courtney Jordan (May 16, 2025), attached as Exhibit 3.

7. In this May 16, 2025, email, regarding the defense's "Request for 'ongoing treatment logs', 'diagnostic reports', and 'deceased dog records'," the Government reiterated its position that "veterinary records that post-date the already produced initial thorough evaluation of the dogs' condition are not discoverable." Exhibit 3.

8. However, the Government also stated in the same communication: "In response to your identification of a subset of records that may have Brady value, and out of an abundance of caution, the government produced veterinary records arguably responsive to defense's argument that some of the dogs could have skin conditions resulting in scarring." Exhibit 3.

9. While the defense appreciates the production of this limited subset of records, this partial disclosure underscores the Government’s general refusal to provide the comprehensive ongoing treatment logs, diagnostic reports, and particularly the complete records for all 190 dogs, including detailed records for the 12 deceased dogs, which the defense maintains are essential for trial preparation, are material to the defense, and are likely to contain further exculpatory or impeachment evidence. The Government's May 16th response, therefore, confirms the ongoing impasse regarding the broader scope of records sought by the defense, necessitating this Motion.

## ARGUMENT & AUTHORITIES

The Defendant is entitled to the requested records pursuant to Federal Rule of Criminal Procedure 16(a)(1)(E) and the Government’s obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). The unexplained death of 12 dogs while in Government custody makes full disclosure of all related records even more imperative.

### I. The Requested Records are Discoverable Under Federal Rule of Criminal Procedure 16(a)(1)(E).

Mr. Johnson is entitled to the compelled production of the requested records pertaining to the 190 seized dogs for several critical reasons. First, these records are unequivocally within the

Government's possession, custody, or control. Second, the records are independently discoverable under Federal Rule of Criminal Procedure 16(a)(1)(E) as they are acutely material to preparing a complete and effective defense. Third, the Government is obligated to produce these records under *Brady v. Maryland* and its progeny, as they are likely to contain exculpatory or impeachment evidence vital to ensuring a fair trial. The unexplained death of 12 dogs while in Government custody, and the Government's subsequent limited disclosures, make full production of all related records even more imperative.

**a. The Records are within the Government's Possession, Custody, or Control**

The dogs are, by the Government's own admission, in the care and legal custody of the United States Marshals Service (USMS), a federal law enforcement agency. *See* Exhibit 1 ("While in USMS care . . . ). A federal contractor is responsible for the day-to-day care, housing, veterinary treatment, and generation of records related to these dogs. This federal contractor is not an independent third party but is acting as an agent of the U.S. Government, specifically, the USMS, in maintaining this seized evidence. Records created by this contractor in the course of performing its duties for the Government are therefore attributable to the Government.

The prosecution has an affirmative "duty to search" or "duty to learn" of discoverable information held by these entities. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). The records sought here fall squarely within the Government's control. The 190 dogs were seized by federal law enforcement pursuant to federal authority as alleged in the Superseding Indictment. Dkt. No. 94, ¶ 16. The Government, through the Department of Justice, has demonstrated its access to and control over information from this contractor, for instance, by providing the location of the facility for inspection [Exhibit 1], communicating the number of deceased animals [*Id.*] and conveying the contractor's protocols (e.g., parking, restroom locations at the facility [*Id.*]).

Given that the USMS is an integral part of the federal law enforcement apparatus and the contractor is acting on its behalf, the prosecution has a duty to inquire of both the USMS and its contractor for all records pertaining to the seized animals and to produce all discoverable materials to the defense. The Government cannot shield discoverable records from production merely because they are physically maintained by a contractor acting under its direction and for its benefit in preserving evidence central to this case. The information is clearly accessible to the Government, as demonstrated by their ability to provide updates and arrange inspections.

As such, the records generated by the federal contractor—which document the care, condition, treatment, and ultimate disposition, including any death or euthanasia, of the 190 dogs seized in this investigation—are unequivocally within the Government's "possession, custody, or control" for the purposes of Federal Rule of Criminal Procedure 16.

**b. The Records are Acutely Material to Preparing the Defense, Especially in Light of the Death of 12 Seized Dogs.**

The death of 12 of the 190 seized dogs, which are primary physical evidence, significantly amplifies the materiality of the requested records. Any such favorable evidence is "material" if there is a reasonable probability that, had it been disclosed, the result of the proceeding would have been different. *United States v. Bagley*, 473 U.S. 667, 682 (1985). The defense is entitled to understand the loss of evidence. Records pertaining to the 12 deceased dogs—including all veterinary reports, documentation of "existing medical conditions," reasons for euthanasia, necropsy reports (if any), and logs of care leading up to their deaths—are essential for the defense to understand why this evidence is no longer available. This information is vital to assess the Government's assertion that euthanasia was necessary or that deaths occurred despite all possible medical intervention [Exhibit 1]. The defense is unable to conduct its own assessments of these 12

deceased animals, making the Government's records the only source of information about their post-seizure condition and demise.

Further, the condition, behavior, and treatment of the 190 dogs, both at the time of seizure and throughout their extended custody by the Government, are directly relevant and material to Mr. Johnson's defense against charges that he possessed these animals "for purposes of having the dog participate in an animal fighting venture" [Dkt. No 94, Charges, ¶ 18]. Specifically, these records are material to the defense in four ways. First, to challenge the "purpose" element. Ongoing veterinary and behavioral records may demonstrate that the dogs do not exhibit traits consistent with fighting animals, or that their condition is inconsistent with the Government's allegations. Such evidence is crucial to rebutting the specific intent element of the charges. The circumstances surrounding the health, decline, and death of 12 dogs may directly challenge the Government's initial characterizations or reveal information about their actual condition at the time of seizure that was not apparent in initial intake reports. Second, to assess intake records. Comparing the Government's initial intake assessments with subsequent, ongoing records of the dogs' health and behavior is essential for the defense to verify the accuracy and completeness of the initial findings. Records of the care and condition of the remaining 178 dogs are crucial to determine if they are receiving appropriate care and to assess the risk of further loss of evidence. Patterns of illness or inadequate care, if present, could be revealed.

Third, to develop expert testimony. Defense experts in veterinary medicine or animal behavior will require these complete records to form their own opinions about the dogs' nature, condition, and the likelihood of their use in an animal fighting venture. Defense experts will need complete records for both living and deceased animals to opine on the causes of death, the appropriateness of care, the dogs' conditions, and the allegations against Mr. Johnson. Fourth, to

address the forfeiture allegations. The Superseding Indictment includes a forfeiture allegation for "any and all animals involved." Dkt. No. 94, Forfeiture Allegation, ¶ 2. The current condition and status of these animals are directly relevant to any potential forfeiture proceedings. The death of animals while in Government custody directly impacts any forfeiture claim, particularly if records suggest issues with the care provided.

**c. The Requested Records May Contain Exculpatory Evidence Discoverable Under *Brady v. Maryland*.**

The Government has a constitutional duty, established *in Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny (e.g., *Giglio v. United States*, 405 U.S. 150 (1972)) to disclose to the defense all evidence that is favorable to the accused and material either to guilt or punishment. This duty encompasses both exculpatory evidence tending to show the defendant is not guilty and impeachment evidence damaging the credibility of government witnesses or evidence. The Government's obligation is affirmative and extends to evidence known to others acting on the Government's behalf, including law enforcement and other agencies like the U.S. Marshal Service and its contractors. *Kyles*, 514 U.S. at 437.

Given the nature of the charges in this case, which rely heavily on the alleged condition, traits, and purpose of the 190 seized dogs, the undisclosed records detailing their post-seizure care, condition, behavior, and the circumstances of the 12 deaths are highly likely to contain *Brady* material. The defense cannot be expected to simply accept the Government's assertions, such as the claim that 12 dogs "either died despite all possible medical intervention or were humanely euthanized to minimize pain and suffering from existing medical conditions" [Exhibit 1], without access to the underlying documentation.

**i. Potential Exculpatory Evidence**

The undisclosed records could contain various forms of exculpatory evidence. First, regarding the 12 deceased dogs, detailed veterinary records, necropsy reports (if performed), and notes documenting the "existing medical conditions" leading to death or euthanasia are critical. If these conditions were unrelated to any alleged fighting trauma or "fighting traits" (e.g., common canine illnesses, congenital issues, conditions resulting from post-seizure stress or inadequate care), this would directly undermine the Government's narrative that these specific animals were part of an animal fighting venture or possessed for that purpose. Further, records showing these deceased dogs lacked scarring, injuries, or behavioral traits consistent with fighting prior to the onset of the conditions leading to their death would be exculpatory

Second, with respect to the remaining 178 dogs, ongoing, objective behavioral assessments by the federal contractor could reveal that many, if not all, of the surviving dogs exhibit non-aggressive, social temperaments, or lack the specific "fighting traits" (e.g., "gameness," [Dkt. No. 94, Background ¶4] alleged by the Government. Such findings would directly contradict key allegations supporting the charges. In addition, veterinary records documenting the ongoing health of the surviving dogs, or noting a lack of fight-related injuries or conditions, could further refute the claim that these animals were maintained for fighting purposes.

**ii. Potential Impeachment Evidence**

The records may also contain evidence that could be used to impeach Government witnesses or the reliability of its evidence. The initial intake assessments provided to the defense form a part of the Government's evidence. If ongoing records from the contractor (e.g., detailed veterinary exams or behavioral logs) contradict these initial findings (e.g., by showing misdiagnosed conditions, different behavioral traits once the dogs settled, or absence of alleged

fight-related indicators), such records would be crucial for impeaching the Government's initial assessment and any witness relying on it. Additionally, without complete records, the defense cannot scrutinize the Government's claim that euthanasia was necessary or that deaths occurred "despite all possible medical intervention" [Exhibit 1]. The records could reveal alternative interpretations, questionable decision-making, or a lack of appropriate care, thereby impeaching the Government's explanations for the loss of this evidence.

Furthermore, as defense counsel noted, "The government euthanized evidence." [Exhibit 2, p. 3]. Information suggesting mismanagement, inadequate care leading to decline or death, or a failure to diligently document the condition of these animals could be used to impeach the overall credibility of the Government's investigation and handling of crucial physical evidence. Lastly, any inconsistencies between what was stated in the initial intake, what is contained in the ongoing care records, and what government agents or contractors might testify to would constitute impeachment material.

Accordingly, the defense should not be forced to guess what exculpatory or impeachment material may exist within the voluminous records detailing nearly seven months (from October 17, 2024, to the present date of May 16, 2025) of Government custody and care for these 190 animals. Production of these records is essential to safeguard the Defendant's due process rights.

**SPECIFIC RECORDS SOUGHT**

The Defendant requests an Order compelling the Government to produce, for inspection and copying, all records, documents, data, photographs, and videos related to the 190 dogs seized in this case, from October 17, 2024, to the present, including but not limited to:

- All veterinary examination reports, treatment logs, medication records, and prognoses.

- All behavioral assessments, notes, observations, and reports regarding each animal's temperament, sociability (with humans and, if observed, other animals), and any behavioral modification or enrichment activities.
- Daily care logs, including feeding schedules, housing conditions, and exercise routines.
- Any and all photographs or videos taken of the animals since the initial intake.
- Any correspondence, memoranda, or other communications between the federal contractor, the U.S. Marshal Service, and the Department of Justice or U.S. Attorney's Office regarding these animals.
- Any records of costs associated with the care and maintenance of the animals.

Specifically for the 12 dogs reported deceased while in Government custody:

- All veterinary records detailing their condition from intake until death/euthanasia.
- All documentation related to the decision to euthanize (if applicable).
- All necropsy reports or other post-mortem examination results.
- Records of "existing medical conditions" cited by the Government; and any communications regarding their illness, treatment, or death.

**CONCLUSION**

For the foregoing reasons, Defendant Leshon Eugene Johnson respectfully requests that this Court grant this Motion and enter an Order compelling the Government to produce forthwith all requested records, documents, and data concerning the 190 dogs seized in this matter from the date of their seizure to the present.

Respectfully submitted,

SULI LAW, PLLC

/s/ Courtney R. Jordan
Courtney R. Jordan, OBA #31892
SULI LAW, PLLC
2448 E 81st St., Suite 4818
Tulsa, Oklahoma 74137
Tele: (539) 322-5442
Fax: (539) 232-2254
Courtney@sulilawpllc.com

THE WRIGHT LAW FIRM, PLLC

/s/ Thomas M. Wright
THOMAS M. WRIGHT, OBA # 20378
THE WRIGHT LAW FIRM, PLLC
3117 NW 20th Street
Oklahoma City, OK 73107
405.819.0888 (tele)
405.459.0902 (fax)
tom@tomwrightlaw.com

*Attorneys for LeShon Johnson*

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 19, 2025, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of Notice of Electronic Filing to the following ECF registrant(s):

Sarah Brown – Trial Attorney, DOJ
Ethan Eddy – Trial Attorney, DOJ
Jordan Howantiz – Assistant United States Attorney

/s/ Courtney R. Jordan__________
Courtney R. Jordan