# *United States v. LeShon Johnson*, 6:25-cr-12-JFH

# Exhibit C to Govt.'s Mot. for Upward Variance

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

UNITED STATES OF AMERICA

vs. CASE NO.: 3:13cr100-WKW

DONNIE ANDERSON,

Defendant.

REDACTED TRANSCRIPT

* * * * * * * * * * *

INDIVIDUAL SENTENCING PROCEEDINGS

* * * * * * * * * * *

BEFORE THE HONORABLE W. KEITH WATKINS, UNITED STATES DISTRICT JUDGE, at Montgomery, Alabama, on Friday, November 7, 2014, commencing at 9:08 a.m.

APPEARANCES:

FOR THE GOVERNMENT: Ms. A. Clark Morris
Mr. Kevin P. Davidson
Assistant United States Attorneys
OFFICE OF THE UNITED STATES ATTORNEY
131 Clayton Street
Montgomery, Alabama 36104

FOR THE DEFENDANT: Ms. LaRonda Renee Martin
Attorney at Law
FEDERAL DEFENDERS
MIDDLE DISTRICT OF ALABAMA
817 South Court Street
Montgomery, Alabama 36104

Proceedings reported stenographically;
transcript produced by computer.

EXAMINATION INDEX

CHRISTOPHER CARVER
DIRECT BY MS. MORRIS 14
CROSS BY MS. MARTIN 26

LORRAINE ANN ANDERSON
DIRECT BY MS. MARTIN 32
CROSS BY MS. MORRIS 41
REDIRECT BY MS. MARTIN 47

RENA ROSS
DIRECT BY MS. MARTIN 49

* * * * * * * * * * *

(The following proceedings were heard before the Honorable W. Keith Watkins, United States District Judge, at Montgomery, Alabama, on Friday, November 7, 2014, commencing at 9:08 a.m.:)

(Call to Order of the Court)

THE COURT: We're here today in a sentencing of the -- in the case of the United States of America versus Donnie Anderson, 13cr100.

For the record, let's take appearances, first for the government.

MS. MORRIS: Yes, Your Honor. Clark Morris on behalf of the United States along with Kevin Davidson on behalf of the United States. Seated at counsel table with us is Detective Chris Carver with the Auburn Police Department.

THE COURT: Good morning.

MS. MORRIS: Good morning, Your Honor.

AGENT CARVER: Good morning.

exhibits to the government's motion will remain in the record.

Now, I have some other motions that I'll deal with in a moment, but I believe that's all of the procedural motions. Is the government aware of any others?

MS. MORRIS: No, Your Honor.

THE COURT: Is the defendant aware of any other motions?

MS. MARTIN: I'm not aware of any other motions, Your Honor. But for the record, we would object to the Court excluding the testimony of Mr. Robinson. We just want to preserve it for the record --

THE COURT: Noted and --

MS. MARTIN: -- based upon our information provided in our motion.

THE COURT: Noted and overruled.

In compliance with *Booker*, the Court, while not bound to apply the guidelines, has consulted them and has taken them into account on the issue of the appropriate range of sentence to be imposed in this case. Having made findings as to objections to the presentence report and having heard extensive testimony in this case, the Court adopts the findings of the -- the factual statements of the presentence report and finds that the offense level is 13, the criminal history category is I, the guideline range is from 12 to 18 months, the supervised release period is from one to three years as to each count -- and I

believe there are seven counts in this case -- and the fine range is from 3,000 to $30,000.

Does the government dispute these calculations?

MS. MORRIS: We do not.

THE COURT: Does the defendant dispute those calculations?

MS. MARTIN: No, Your Honor.

THE COURT: Now, does the defendant have anything in mitigation or otherwise for the Court to consider before sentence is pronounced in this case? To be clear, this is an opportunity for the defendant to address the Court if he wishes, but he's not required to do so.

Go ahead, Ms. Martin.

MS. MARTIN: Your Honor, we have one witness and argument.

THE COURT: Okay.

MS. MARTIN: Ms. Anderson, Lorraine Anderson.

THE COURT: Come on up, Ms. Anderson.

THE CLERK: Raise you right hand.

(The witness is sworn)

THE CLERK: Right there.

THE COURT: Good morning.

THE WITNESS: Good morning, Your Honor.

THE COURT: If you would, sit close to the mike so we can hear you.

(Government's Exhibit 1 is displayed)

THE COURT: The first picture up is in evidence, and it is a dog yard of Mr. Anderson.

Go ahead, Ben.

(Government Exhibit 2 is displayed)

THE COURT: One of Mr. Anderson's dogs. Government's Exhibit 2.

(Government's Exhibit 2-F is displayed)

THE COURT: Another of the very thin, if not emaciated, dogs.

Go ahead.

(Government's Exhibit 2-H is displayed)

THE COURT: Chafing under the neck of a dog in Mr. Anderson's possession.

(Government's Exhibit 2-N is displayed)

THE COURT: Another thin animal, if not emaciated, perhaps emaciated.

(Government's Exhibit 3-A is displayed)

THE COURT: And a puppy on a heavy chain. The government has detailed the chaining of the dogs with the excess of their weight. I daresay that that chain appears to be heavier than the puppy.

The government has detailed that 70 of these dogs were euthanized, Mr. Anderson's dogs; and I believe some more of the ones found at the house died or were euthanized. Ninety-two of

Case 3:13-cr-00100-WKW-CSC Document 725 Filed 03/10/15 Page 81 of 91



the 114 were underweight. Mr. Rickey, the ASPCA investigator, said that this was the largest dog yard -- Mr. Anderson's was the largest dog yard he had ever seen, and he's done over a hundred investigations.

I have evidence of four to five dogs in a pile at the parking area after a fight at Mr. Anderson's. No, there were no bones. No, no one saw them be killed except on one occasion. But no one disputes that the most likely result of a losing dogfight for a dog that loses a fight is that dog is executed or dies from the injuries. And that is on the host, generally, according to the testimony before me.

Carlos Johnson said he had seen two or three dead dogs laid out after one of Mr. Anderson's fights. I'll note here, by the way, that Mr. Johnson said that Mr. Anderson's fights had way more people because they had way more money. That's a quote from him.

Indeed, he showed up at one of Mr. Anderson's fights with $340,000 cash in his secret compartment of his Nissan, which had seats with electronic switches that if you hit the defrost, the seat would somehow pop up, and there were secret compartments for drugs and money. He showed up with $340,000 cash at one of Mr. Anderson's fight events. At that event, he bought five kilos of cocaine for $28,000 each and spent a good bit on gambling on dogs. And as the sailor said in New Orleans, he wasted the rest, I guess.

(Government's Exhibit 10 is displayed)

THE COURT: According to paragraph 30, on the evening of April 7th, 2012, through the morning of April 8th, 2012, the FBI established surveillance of a dogfight hosted by this defendant, Mr. Anderson, in Waverly. It's one of those occasions where the PSR says approximately 60 to 80 people attended the fight, including children. And I've found that there was one child there but not necessarily children.

The fight was surveilled. A traffic stop occurred in which other coconspirators who pled to this same conspiracy as Mr. Anderson, but only to the conspiracy count, were found in possession of the dog that's on the screen. This is a deceased female pit bull with apparent bite wounds this was found in the back of their vehicle coming from Mr. Anderson's fight.

A necropsy report was later completed by the Humane Society of the United States. According to the report, the cause of death was dogfighting wounds; specifically, severe tissue trauma, inflammation, and blood fluid loss. The mechanism of death was systemic shock, respiratory and circulatory collapse.

The dog had severe wounds around the head, ears, face, lips, mouth, neck, legs, feet, and tail that were consistent staged dogfighting. The wounds consisted of punctures, lacerations, and abrasions, many of which had fresh blood still present and oozing from the wounds. The swelling around the

wounds of the face, jaw, and front legs was due to inflammation from the injuries which was consistent with a survival period postinjury. The severity and number of injuries would have caused a substantial systemic inflammatory response in addition to blood loss and fluid loss and dehydration during the fight. The injuries would have been very painful, further contributing to shock.

The presence of adult heartworms increased the stress of the heart function during the rigorous physical exertion during the dogfight and contributed to systemic shock. The scars and ear disfiguration patterns were consistent with previous dogfighting injuries. The enlarged nipples indicated that the dog had historically nursed more than one litter of puppies. The dog had a body condition score by the ASPCA of thin to very thin, which is often seen with staged dogfighting where the training for a fight involves dropping the body weight. The empty gastrointestinal tract indicated that the dog had not eaten the previous two or three days.

Let me be clear. The sentence I'm going to impose in this case, whether considered a variance or a departure -- and it's going to be both -- but in either case, is, in my view, reasonable and would be given in any event, irrespective of the adjustments that could have occurred -- or could have been made to the guidelines, all of which I have duly considered. This is so, irrespective of whether it's called a departure or a

variance. I would enter this sentence in any event because it is reasonable under the totality of the circumstances in this case and under other factors that I am about to discuss.

Under the factors I have already discussed, I find that a departure for extraordinary cruelty based on the scope of this conspiracy -- and the scope I've detailed: temporal, in money and gambling and other criminal activity and abuse and cruelty to dogs, the number of dogs, the number of dogs that had to be euthanized and other factors that I've cited -- that the departure should be ten levels, from 13 to 23.

Ms. Martin, if you and your client would come forward.

Mr. Anderson, I find that even with that departure, it does not adequately reflect -- that the guidelines do not adequately reflect the offense conduct in this case and that generally a variance up to a level of 29 above the 23 would be the appropriate range of sentence to be imposed in this case.

Pursuant to this Court's authority and having considered the guidelines and given them very serious consideration and having studied the matter in dogfighting cases and located approximately 96 reported dogfighting cases in this country and pursuant to the Court's authority under *Booker* to impose a sentence outside the guideline range, it is the judgment of the Court that you are hereby committed to the custody of the Bureau of Prisons to be imprisoned for a total term of 96 months. This term consists of 60 months on count one

for the conspiracy and 36 months on counts three, four, nine, 14, 17, and 43 to be served concurrent to each other but consecutive to count one for a total of 96 months.

There's only one other defendant in this batch of defendants of 11 that pled to more than count one, and that was Mr. Martin, who had a gun charge, a 922. And there was one defendant who didn't plead to the conspiracy. That's Mr. Sandy Brown, who had the lounge that was used on a couple of occasions when it was raining.

This defendant, however, pled -- and properly so, I think, under all the evidence -- not only to count one, which has a 60-month statutory maximum, but to six other counts: count three, sponsoring an animal fighting venture; count four, sponsoring an animal fighting venture; count nine, sponsoring an animal fighting venture and knowingly delivering, possessing, training, and transporting an animal for an animal fighting venture; count 14, sponsoring and exhibiting an animal in an animal fighting venture; count 17, knowingly buying, selling, delivering, possessing, training, transporting, and receiving an animal for participation in an animal fighting venture; and count 43, to which he pled, which is that he aided and abetted the other coconspirators to conduct, finance, manage, supervise, direct, and own all or part of an illegal gambling business involving dogs and five or more other persons who were involved and who conducted, financed, managed, supervised, directed, and

COURT REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

This 17th day of February, 2015.

/s/ Risa L. Entrekin
Registered Diplomate Reporter
Certified Realtime Reporter
Official Court Reporter

* * * * * * * * * * *

CERTIFICATE OF REDACTION

I certify that the foregoing is a true and correct copy of the transcript originally filed with the Clerk of Court on February 17, 2014, and incorporating redactions of personal identifiers requested by Patricia Kemp, attorney of record, in accordance with Judicial Conference policy.

Redacted characters appear as a black box ■ in the transcript.

This 9th day of March, 2014.

/s/ Risa L. Entrekin
Registered Diplomate Reporter
Certified Realtime Reporter
Official Court Reporter